IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| STEVAN B. DALRYMPLE, Individually | * | |
| and as Special Administrator of the Estate | * | |
| of Matthew Jordan Dalrymple, Deceased, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No.5:04CV00006 SWW |
| | * | |
| THE HARRIS WASTE MANAGEMENT | * | |
| GROUP, INC. and IPS BALERS, INC., | * | |
| | * | |
| Defendants. | * | |

**Memorandum Opinion and Order**

This case is before the Court on defendants' motions for summary judgment and motions to strike plaintiff's designation of an expert witness. Plaintiff responded to the motions and separate defendant Harris Waste Management Group, Inc. ("Harris") filed replies to plaintiff's responses. For the reasons stated below, the motions are denied.

**Background**

At the time of his death, Matthew Jordan Dalrymple ("Jordan"), was employed by Jefferson County, Arkansas, as a general laborer at the Jefferson County recycling facility. Although there were no eyewitnesses, the evidence suggests that on August 1, 2002, Jordan climbed up the conveyor to clear a jam at the compacter hopper, fell into the compaction chamber, and was crushed between the edge of the compaction chamber and the baler ram.[1]  The subject baler was designed

---

[1]The baler that is the subject of this litigation is a piece of equipment used by recycling facilties to pack together large amounts of newspaper and cardboard into compact bales for ease of storage and shipping. The 'feed hopper' is the compartment of the baler where the newspaper or cardboard falls into and where the 'ram' moves forward to compact the material.

by Harris on or about 1985, and manufactured by Harris on or about 1997.  In or about 2001, separate defendant IPS Balers, Inc. ("IPS") purchased the baler from Lin Pac, Inc.  IPS then sold the baler to Jefferson County Recycling Center on or about January 2002.

The baler was shipped in three sections to Jefferson County for installation.  Mr. Jim Fox contracted with IPS to install the baler and a conveyor to be used with the baler for Jefferson County. Mr. Fox and others installed the baler and conveyor at the Jefferson County recycling facility in mid-January 2002.  Separate defendant Harris did not manufacture the conveyor installed at the recycling facility.

Plaintiff Stevan Dalrymple,  individually and as special administrator of Jordan Dalrymple's Estate, brings this suit asserting claims of negligence, strict product liability, and breach of warranty against Harris and IPS.  He asserts the baler manufactured by Harris and the baler/conveyor system put into the stream of commerce by Harris and IPS was defective and unreasonably dangerous. Plaintiff also argues the training manual furnished by Harris and used by Fox to train the Jefferson County employees was incorrect, specifically concerning a switch on the baler.  He claims defendants failed to give reasonable and adequate instruction concerning safety conditions and methods for the system's operation, and failed to warn of dangers inherent in the product's use. Plaintiff further asserts Harris breached an implied warranty of merchantability, and that IPS breached an implied warranty of fitness for a particular purpose.  In addition to compensatory damages, plaintiff seeks punitive damages.

Separate defendant IPS moves for summary judgment on the basis of plaintiff's expert witness's testimony that the faults of the baler are the result of original design defects due to the absence of certain safety features that could have been incorporated into the original design.  IPS

argues that it did not design or manufacture the baler, and did not modify it or the conveyor in any way that would have contributed to the accident.  It further contends that through Fox, it provided all the training it was contractually obligated to provide; it violated no duty to anyone and thus is entitled to summary judgment on the negligence and breach of warranty claims; and because the alleged defects are all design-related, any liability would pass through to Harris.  IPS also seeks summary judgment on plaintiff's claim for punitive damages.  In addition, IPS moves to strike plaintiff's designation of Igor Paul as expert witness.[2]

Separate defendant Harris moves to strike Paul as plaintiff's expert witness and moves for summary judgment on the basis that Paul's testimony should be excluded under the principles of *Daubert*.  Defendant Harris contends that without the testimony of Paul, plaintiff cannot prove his strict liability or negligence claims.  It also argues that there is no evidence to support plaintiff's breach of warranty claim against Harris.  In a separate motion, Harris argues it is entitled to summary judgment on plaintiff's claim for punitive damages.

## Discussion

## I.     Admissibility of Igor Paul's Testimony Pursuant to *Daubert*

After plaintiff filed suit, he designated Igor Paul, PhD., to provide expert testimony regarding defective design, warnings, instructions, and negligence.  Dr. Paul is the only expert plaintiff has designated to provide testimony on these subjects.

Dr. Paul received a doctoral degree in mechanical engineering from the Massachusetts Institute of Technology ("MIT") in 1964, specializing in machine and product design and industrial control systems.  As a professor of mechanical engineering at MIT for 39 years, he taught industrial

---

[2]IPS motion and brief in support to strike [docket entries 55 & 56] incorporate Harris' motion and brief [docket entries 49 & 50].

machine and product design and automatic control systems to undergraduate and graduate students and conducted research in these areas until he retired in 2003. He has been a registered professional engineer for over 39 years,[3] and has over 80 publications in the areas of designing, engineering, education, solid waste disposal, transportation, and bioengineering.

In his November 14, 2003, report, and during his deposition, Dr. Paul advanced five alternative design theories in support of his opinion that the design of the Harris baler and its control system was defective. He testified that there should have been an interlock system on the conveyor and/or at the conveyor/hopper infeed transition area which would automatically stop power to the compactor and the conveyor when a worker tried to get access to that area to clear a jam. He testified there should have been a set of handrails at the top of the conveyor sidewalls with emergency trips which would shut down power to the conveyor and compactor when someone was climbing to the top of the conveyor. Dr. Paul said the baler was defective because it did not have consistent, logical, and well-marked baler operating control switches, and because it did not have emergency stop controls which would automatically return the compacting ram to the retracted position if the emergency stop was activated during the compacting stroke of the ram. Lastly, he said there should have been proper warnings and instructions on the operator console, platform, and equipment describing safe procedures for clearing jams.

In *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993), the Supreme Court charged trial judges with the responsibility of acting as "gatekeepers" to ensure that expert testimony is founded on valid and reliable scientific knowledge. Subsequently, in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), the Supreme Court made it clear that the *Daubert* standard

---

[3]Pl's. Resp. to Mot. Strike/Summ. J. [docket entry 68], Ex. 5.

applies to all "expert" testimony and not just purely "scientific" expert testimony.  In 2000, Federal

Rule of Evidence 702 was amended in response to *Daubert* and *Kumho*.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert* set forth a non-exclusive list of factors a court can use in assessing the reliability of

scientific expert testimony: whether the expert's technique or theory can be or has been tested;

whether the technique or theory has been subject to peer review and publication; the rate of error

associated with the technique or theory; and whether the technique or theory has been generally

accepted in the scientific community.  *See Daubert,* 509 U.S. at 593-94.  As *Kumho* recognized,

these factors do not constitute a definitive list, but rather must be tied to the facts of the particular

case.  526 U.S. at 150.  The *Daubert* factors "'may or may not be pertinent in assessing reliability,

depending on the nature of the issue, the expert's particular expertise, and the subject of his

testimony.' . . . Too much depends upon the particular circumstances of the particular case at issue."

*Id.*   The objective is to ensure the reliability and relevancy of expert testimony.  *Id.* at 152.

Harris argues Paul's testimony is inherently unreliable and will not assist the jury in

understanding any fact at issue. Citing *Unrein v. Timesavers, Inc.,* 394 F.3d 1008 (8th Cir. 2005),

*Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076 (8th Cir. 1999), and *Peitzmeir v. Hennessy Indus., Inc.,*

97 F.3d 293 (8th Cir. 1996), Harris contends Paul's alternative design theories have not been tested

and Paul has not prepared any drawings or diagrams to support his alternative designs.  It argues

Paul  failed to submit any practical information to support his alternate baler designs which would

allow proper testing and analysis to occur; never designed a baler or baling system like the one involved in the accident; has not tested any of the design alternatives he is proposing for the subject baler; has not performed any studies or analysis of balers for this case; and is not aware of any baler manufacturers that have implemented even one of his design alternatives.  In addition, Harris states that while Paul's alternate design theories have not been the subject of formal peer review, they have been evaluated and discounted as being unfeasible, and are not used by any baler manufacturer. Finally, Harris asserts the "error rate" for Paul's alternate designs is unknown and his designs are not generally accepted in the baling community.

In response, plaintiff admits there are only a few mandatory standards for manufacturers as far as what safety devices balers must have.  The industry has attempted some self-regulation, and the American National Standards Institute, Inc. ("ANSI") has propounded similar voluntary standards - the ANSI Z245.5-1990 Standard - [4] which relies primarily on lock-out, tag-out procedures. However, the ANSI also calls for guarding and/or interfaced doors to prevent access by an employee to the machine.  Further, the National Institute for Occupational Safety and Health ("NIOSH") has  suggested several voluntary methods to prevent worker injury or death, including guarding of moving parts, lock-out, tag-out; sensors; and transmitters which are designed to acknowledge when a user or other person crosses their path.[5]  Plaintiff also points out that after the accident, Jefferson County put cameras in place to ensure the operator at the control panel can see the conveyor belt at all times.[6]

_____

[4] *See* Pl's Mot. and Br. for Leave to Supp. and Correct [doc. # 74], Ex. A.

[5] *See* Pl's. Resp. to Mot. Strike/Summ. J.[doc. # 68], Ex. 3.

[6] *Id.*, Ex. 9 at 78-79.

6

Dr. Paul has designed systems for feeding hoppers for material processing, including waste processing.  This includes a conveyor system and the conveyor interface with the hopper.[7]  While he has not designed a baler system, he testified he had designed four or five interface systems for balers used in waste management, and has designed everything on the machine at Jefferson County except the conveyor.[8]   Dr. Paul testified he implemented his alternative safety designs into two baler systems.  One was in a New Hampshire power plant, which removes waste, ashes, and fuel, and involves a conveyor system and a hopper.  The other was a recycling operation in New York which had a compactor and baler and used the machine for different applications.[9]

Dr. Paul testified that when designing safety devices for four or five systems in the field, his focus was to provide a safety system when operators access the hopper, which is in essence a big hole. He has used a keyed access gate, which was only accessible if the power was shut off.[10]  He has used electronic eyes to shut down the machine if an employee crossed the beam.[11]  He has also observed other safety features such as a cat-walk around the top of the hopper.  This allows the worker access to a jam without having to approach the edge of the big hole.[12]

Dr. Paul testified he had designed at least two systems that have sensors that operate as interlock devices if an individual gets on a conveyor near a hopper.[13]  This is similar to a safety

---

[7] *Id.*, Ex. 4 at 39.

[8] Harris' Mot. Summ.J/Strike Expert [docket entry 49], Ex. C at 40-41.

[9] Pl's. Resp. to Mot. Strike/Summ. J.[doc. # 68], Ex. 3. at 43-44.

[10] *Id.* at 47-48.

[11] *Id.* at 84-85.

[12] *Id.* at 66.

[13] *Id.* at 85.

device suggested by OSHA that utilizes photoelectric or radio frequency presence-sensing, which shut the machine down if the user or third party breaks the beam.[14] Dr. Paul testified this technology has been used for many years and is available from various companies.[15] As an attachment to his affidavit filed in support of plaintiff's response to Harris' motion to strike, Paul submits a drawing, engineering sketch, and specifications for his design.[16]

In addition to testimony that the Harris baler was defectively designed because it lacked certain safety features,  Paul testified that there were inadequate warnings and instructions on how to properly clear "jams," and defectively designed baler control switches such that an operator would believe that the position for the semi-automatic baling function is easily confused with the "off" position.  panel.  Harris asserts Paul has not presented any alternatives for safer warnings or instructions on how to clear jams in terms of language, size, shape, color or location, nor has he identified the specific manner in which the control panel's selector switches should have been designed to alleviate his concerns about the current design creating confusion for the operator.  In addition, Harris argues that because Jordan was aware of the dangers involved with the baler and walking up the conveyor to clear jams, plaintiff's claim of defective warning/instruction is inapplicable.

Dr. Paul testified that the three-position switch that controls the baler function ("auto" "semi-auto" "manual") was misleading and confusing and thus defectively designed.  In particular, Paul said that because the "middle" or "straight-up" position for the other switches on the control panel

---

[14]*Id.*, Ex. 6.

[15]*Id.,* Ex. 5 at 8-9.

[16]*Id.*, Ex. 5.

correlate with "off," designing the switch that controls the baler function in such a manner that the "middle" or "straight-up" position correlates with "semi-auto" could lead an operator to conclude incorrectly that the baler is "off" when it is in fact in the "semi-auto" mode.  Mr. Henry Jobe, Harris' Director of Engineering, testified, however, that if the control switch had, in fact, been in the middle or "straight-up" position such that the baler was in the "semi-auto" mode, Jordan would not have been crushed by the baler ram.  According to Jobe, in order for the ram to have moved forward and crushed Jordan after he fell into the hopper, George Ames, the baler operator, would have had to press and hold the "cycle start" button.  It is undisputed that Ames did not press any buttons after Jordan fell into the hopper.  The baler was in the "auto" mode at the time of the accident, which means it was not in the "middle" or "straight-up" position.  Defendant Harris argues that if Ames had moved the switch to the "middle" or "semi-auto" position, thinking it was the "off" position, the accident would not have happened.

According to Paul's report, Ames stated he had the switches to the machine cut off before Jordan went on top of the machine.  All other switches on the control panel, when in the "straight-up" position, were in "neutral" except for the baler control switch operated by Ames at the time of the accident.  Further, there is no dispute that the switch is mislabeled in the manual provided by Harris.  The switch has three positions on the baler's control panel but is listed as a two-position switch in the manual.  Also, the switch has a "semi-auto" position that is not mentioned, defined, or explained in the manual.

In reply, Harris argues Paul's affidavit contains new and supplemental opinions that should not be considered by the Court.  In particular, Harris complains that Paul asserts a new theory of liability, saying that Harris should have provided a catwalk or platform with the baler, which would

allow workers to clear jams.  Further, Harris argues Paul now asserts that a surveillance camera should have been added which would allow the baler operator to see different areas around the baler. Although plaintiff states Paul's design alternatives have been adopted and incorporated by various manufacturers, Harris complains that not one baler manufacturer has implemented the design alternatives recommended by Paul.

In *Unrein v. Timesavers, Inc.,* 394 F.3d 1008 (8th Cir. 2005), the court upheld the exclusion of an expert's testimony in a products liability case where the expert's safety proposal had never been tested and he had not prepared any drawings showing how his device would be integrated into the machine or presented photographs showing its use with similar machines.  In *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076 (8th Cir. 1999), the court refused to allow an expert to testify that a corn head attached to a combine was unreasonably dangerous because it had no awareness barriers.  The court said: "[The expert] has not attempted to construct or even draw the suggested device, much less test its utility as a safety device or its compatibility with the corn head's proper function.  Nor has he pointed to any manufacturer that incorporates awareness barriers into corn heads or similar farming machinery.  In short, he has provided no basis for us to believe that his opinions are anything more than unabashed speculation."  *Id.* at 1084.  In *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293 (8th Cir. 1996), the court upheld the exclusion of an expert's testimony where the expert conceded he had never designed nor tested for safety or utility any of the proposed safety devices that he claimed were missing from the machine in question.  "His only demonstration of an alternative design [was] a series of rough sketches that [had] not been adapted into engineering drawings, much less prototypes."  *Id.* at 297.

In *McPike v. Corghi S.P.A.,* 87 F.Supp.2d 890 (E.D.Ark. 1999), the court allowed the testimony of an expert who did not test the theory specifically in that case but where the record reflected his proposed changes had been adopted and incorporated by various manufacturers over the past several years.  Here, Paul testified his design alternatives have been used in other types of conveyor systems, and he submitted a drawing, engineering sketch, and specifications for his design. He said he tested both physical gate interlocks and electronic eye interlocks on machines in New York and New Hampshire.[17]  Devices such as a platform at the back of the hopper and an interlocked interfaced door at the back of the hopper are used by Harris itself.[18]

The Court finds, pursuant to Fed.R.Evid.. 702, that the motion to strike Paul as an expert should be denied.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Lauzon v. Senco Products, Inc.,* 270 F.3d 681, 694 (8th Cir. 2001).  The Court finds, however, that Paul's testimony must be confined to those design systems he discussed in his November report, deposition, and affidavit, to the extent it summarizes and expounds on his earlier

## II.   IPS Motion for Summary Judgment

Plaintiff alleges IPS is responsible for the death of Jordan because it sold the baler to Jefferson County (a) without a safety interlock system on the conveyor/hopper area of the machine; (b) without handrails or hand holds on the conveyor or sidewalls; (c) without well-marked baler operating control switches; (d) without an appropriately designed conveyor to prevent jams at the top of the conveyor; and (e) without emergency stop controls that automatically return the

---

[17]Pl's. Resp. to Mot. Strike/Summ.J., Ex. 4 at 142-43.

[18]*Id.* at Ex. 8, 96-97; Ex. 11 at 95-6.

compacting ram to a retracted position.  Plaintiff also complains IPS failed to warn and instruct the baling operators about the functions of the individual operating controls and  failed to comply with the applicable minimum safety standards for conveying, compacting, and baling equipment.

Plaintiff claims IPS negligently supplied a defectively designed product.  Separate defendant IPS argues it is entitled to summary judgment on the negligence claim because all of the alleged defects are design-related and there is no duty for an intermediate supplier to redesign a product. IPS argues it is entitled to partial summary judgment on plaintiff's strict product liability claim because even though an intermediate supplier may be strictly liable for supplying a defectively designed product, that liability passes through to the manufacturer of the product via the intermediate supplier's statutory right of indemnity.  Because there is no evidence that any alteration or defect was created by  IPS, it is entitled to summary judgment and indemnity from Harris on the strict liability claims.

IPS further argues there are no facts to establish a breach of warranty claim.  It asserts there is no evidence that the baler malfunctioned or that it was inadequate to serve its ordinary purpose when the warnings given with the baler are heeded.  Further, IPS argues that any breach of implied warranty must fail under the terms of the purchase agreement, which limited such warranties to repair and replacement of defective parts for a six-month period after the sale of the product.

As to plaintiff's failure to warn claims, IPS argues there is no evidence that any failure to warn, whether stemming from an allegation that IPS supplied the product with inadequate warnings or breached its duty to adequately train the employees, proximately caused the accident.  There is no evidence that the baler operators knew Jordan had climbed into the baler hopper, and Ronnie Via, another operator, testified he hit an emergency stop and shut down the baler as soon as he realized

somebody was in the machine.  It is also undisputed that Jordan was not trained to operate the baler, that he climbed the conveyor and got into the hopper of the baler without the permission of his supervisors, and the operators were never aware he climbed the conveyor.

IPS asserts it is undisputed that the Harris operator manual contained all of the required warnings and the machine itself was covered with warning decals.  Mr. Via testified that Jefferson County employees referred to the manual from time to time when they had questions.  Mr. Ames also testified that he and Via used the manual to figure out how to operate the baler.  IPS argues it is undisputed that IPS hired a competent independent contractor, Jim Fox, to train Jefferson County workers, and that he provided training pursuant to the parties' purchase agreement.  Lastly, IPS argues there is no evidence to support plaintiff's claim for punitive damages.

In response, plaintiff asserts the baler/conveyor system IPS sold Jefferson County was defective and unreasonably dangerous for three reasons: 1) IPS did not provide or offer a platform with the system; 2) they did not install an interlock system to prevent someone from going up the conveyor; and 3) the operator's manual was defective and was directly responsible for confusion which led to the accident.  In reply, IPS contends it is the employer's responsibility to provide an OSHA-approved work platform, and there is evidence that Jefferson County has installed work platforms in the past when needed.  Further, IPS argues there is no evidence to show that the presence or absence of the platform had anything to do with the accident, and there is no evidence that any discrepancy in the operator's manual was a proximate cause of the accident.

The Court finds that genuine issues of material fact remain in dispute as to plaintiff's claims of liability against IPS.  Although IPS contends it has no duty as the supplier to redesign a product, under Arkansas law, if a supplier has reason to believe that a product is defective or is likely to have

a defect which would make the product dangerous when used for a purpose or in a manner which the seller should reasonably foresee, then the seller has a duty to make a reasonable inspection of the product to protect those who will use it. *Green v. Equitable Powder Mfg. Co.,* 95 F.Supp. 127 (W.D.Ark. 1951); AMI 1006.  There is evidence from which a jury could find that when IPS sold the system to Jefferson County and installed it, there was only one way to get to the top of the hopper and that was to walk up the conveyor.[19]  Because jams often occur at the opening of the hopper, IPS knew workers might use the conveyor as a means of access to the jam or blockage. Documents that Harris relies on state that platforms incorporating stairs and standard railings should be provided near the openings of hoppers to allow safe access for clearing jams.[20]  Separate defendant Harris' expert Dr. Karvelis testified that when this machine was sold to Jefferson County, access to the baler/hopper required a manual lift, scaffold, or ladder.  He also said that when one installs a system, he needs to figure out what is appropriate for its location.[21]  Mr. Jobe testified that at the time of the accident, the baler was not in compliance with ANSI Standards.[22]  ANSI Standard ASNI Z245.2 (4.3) 1997 states any person reconstructing stationary compactors after the effective date of the standard (1997) shall do so in compliance with all clauses of the standard.[23]  According to Dr. Paul, if a system is not properly designed, it should have a proper interlock system installed

---

[19]The system contained an interlock window for lower jams, but the upper hopper could not be reached from there.  *See* docket entry 59 [Pl's Resp. In Opp. to Mot. Summ.. J.], Ex. 4 at 73.

[20]*See* Pl's. Resp. to IPS Mot. Summ. J. [docket entry 59], Ex. 1 (Attach. to Jobe Dep.).

[21]*Id.*, Ex. 3.

[22]*Id.,* Ex. 1 at 139.

[23]*Id..,* p 12 of Ex. 9 (Attach. To Ex. 3-Karvelis Dep).

when it is resold.[24]  Further, there is no dispute that the manual was incorrect in that the switch on the baler had three positions, including a semi-auto position whereas the manual shows only a two-position switch on the control panel and does not mention or define the semi-auto position.  Because there is evidence from which a reasonable jury could find that the system and the manual were defective at the time of the accident, IPS is not entitled to summary judgment on plaintiff's claim of strict product liability.

Further, there are genuine issues of material fact in dispute as to whether the system was unreasonably dangerous when it was sold to Jefferson County, that IPS knew or reasonably should have known of the danger, and whether the dangerous system was a proximate cause of plaintiff's damages.

As to plaintiff's claim that IPS failed to warn and instruct, IPS insists there is no evidence that any failure to warn or instruct proximately caused the accident.  The Court finds, however, that there is evidence from which a reasonable jury could find that IPS's use of an incorrect manual to train employees, Ames' testimony that IPS never gave him any materials, that he received only two to three hours of training, did not recall being trained about "lock out and tag out" procedures, and that he would use the manual to figure out how to operate the baler[25] is evidence from which a jury could find IPS failed to properly instruct.  As to proximate cause, Ames testified that before Jordan went on top of the machine, he had the switches to the machine cut off, but all the switches on the control panel, except for the baler control switch, were in "neutral" when in the straight-up position.

---

[24]*Id.*, Ex. 5 at 164-65.

[25]*Id.*, Ex. 7 at 20, 25, 32.

In support of his response to IPS' motion for summary judgment on plaintiff's claim of failure to warn, plaintiff points to Fox's testimony that he had been in the business for 25 years but had heard of only an instance or two of someone being injured on a baler-type machine[26] when in fact there were dozens of deaths and numerous injuries. Mr. Tom Tidwell, described by plaintiff as Jefferson County's main liaison with IPS, was present for all of the training sessions and testified he was never told about any other accidents on balers with people going up the conveyor belt.[27] The Court finds there is some evidence from which a reasonable jury could find IPS failed to reasonably and adequately warn of the dangers of the system it installed. Therefore, the motion is denied on this claim.

The Court further finds that genuine issues of material fact remain in dispute as to plaintiff's claim of breach of implied warranty of fitness for a particular purpose.[28] Mr. Jack Jones, Jefferson County Judge, testified that he was led to believe that the baling system was in the same condition as it was when it left the manufacturing plant.[29] Upon inspection after the accident, however, it was noted that the conveyor extended into the hopper, causing the machine to jam up more easily.[30] In

---

[26]*Id.*, Ex. 6 at 117.

[27]*Id.*, Ex. 4 at 83.

[28]In order to prove a breach of warranty of fitness for a particular purpose, the plaintiff must prove he sustained damages; that at the time of contracting, the defendant had reason to know the particular purpose for which the product was required; that defendant knew the buyer was relying on defendant's skill or judgment to select of furnish a suitable product; that the product was not fit for the particular purpose for which it was required; that the unfitness was a proximate cause of plaintiff's damages; and that the plaintiff was a person whom defendant would reasonably have expected to use or be affected by the product. AMI 1013.

[29]*Id.*, Ex. 11 at 66.

[30]*Id.*, Ex.1 at 41-43.

addition, plaintiff argues IPS never mentioned the need for a work platform to provide access to the hopper.

### III.   Harris' Motion for Summary Judgment

Plaintiff asserts three separate grounds for recovery against Harris: strict product liability, negligence, and breach of implied warranty of merchantability.  As to his strict product liability claims, plaintiff alleges defective design and defective warnings and instructions.

Because the Court has determined that Paul should be allowed to testify, there are disputed issues of material fact as to the defectiveness of the product and negligence.  Plaintiff bases his breach of warranty of merchantability claim on the inaccurate manual Harris supplied with the baler and the lack of means to approach the hopper other than where the conveyor meets it. Plaintiff asserts the baler was not merchantable because the manual made no mention of the need for a platform, the semi-automatic switch, or how to clear jams.  "To be merchantable, a product must be fit for the ordinary purposes for which such goods are used and be adequately contained, packaged, and labeled."  AMI 1013.  The Court finds there are genuine issues of material fact as to whether the baler was merchantable and whether the alleged unmerchantable condition was a proximate cause of plaintiff's damages.

### IV.   Punitive Damages

Both Harris and IPS move for summary judgment on plaintiff's claim for punitive damages. They contend there is no evidence from which a jury could find that they acted wantonly in causing Jordan's death or with such conscious indifference to the consequences that malice may be inferred.

> Punitive damages are 'not a favorite of the law' in Arkansas.  An award of punitive damages is justified 'only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred.'  Gross negligence is not sufficient.

Rather, 'it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred.' A claim for punitive damages is properly submitted to the jury under Arkansas law where the claim is supported by 'substantial evidence.'

*Morris v. Union Pacific R.R.*, 373 F.3d 896, 903 (8th Cir. 2004). *See also Lockley v. Deere & Co.,* 933 F.2d 1378, 1389 (8th Cir. 1991)(punitive damages appropriate when defendant "knew or should have known that its course of conduct was about to inflict injury and yet continued its activities with conscious indifference to the consequences").

Plaintiff argues that Harris has known of dangers associated with balers for over fifteen years. Dr. Paul testified that at one time, the solid waste collection processing industry was the second most unsafe industry in the United States. Mr. Jobe said that since 1990, he has testified in at least 25 injury or death cases for Harris and is aware of five deaths on Harris baling machines, three of those deaths occurring on the same type of two ram horizontal baler involved in this lawsuit.[31] Mr. Jobe testified Harris made only sixteen of this model baler. [32] Plaintiff points to a 2003 alert from NIOSH disclosing 34 compactor-related fatalities from 1992 through 2000, in which the victim was caught in or crushed by the compacting ram of a machine, and argues the numbers of injuries caused by Harris baling machines are so large that Jobe would not even guess at the number.[33] Plaintiff questions Harris' failure to maintain records of injuries or deaths as well as problems, complaints, or requested changes by people who use or own their machines and suggests Harris may have intentionally destroyed records.

---

[31]Pl's. Resp. Mot. Summ. J. on Punitive Damages [docket entry 65], Ex. 1 at 12, 15-16.

[32]*Id.* at 28.

[33]*Id.* at 18.

As evidence of alleged conscious disregard, plaintiff asserts there have been no changes in the baler at issue or its progeny, and Harris has not attempted to implement safety changes known in the industry or recommended by the government.  Although Harris admitted it looked at ways to protect the unintentional entry into the baling chamber, and prior to the accident had discussed theories presented by Paul, it said it had not found a measure that was reliable or that would work.  Plaintiff also complains that Harris put no instructions, guidance, or warnings in its manual about how to unjam the opening of the hopper, and the manual does not mention the need for platforms.

According to plaintiff, the baler was equipped with two "automatic eyes."  When the eyes are open,  *i.e.* there is no material blocking the light ray, the ram stops operation.  When the eye is broken by material, the machine notifies the ram to operate.  When the conveyor is off (as was the case in Jordan's accident) and the eyes are not blocked, the ram is not operating and the machine appears to be "sleeping."  To Jordan, the machine appeared to be "off" but in reality it was only "sleeping."  When he tripped or fell into the hopper, he broke the electric eye, which told the ram to go forward.  Plaintiff argues that even though a NIOSH report suggests all machines be equipped with safety interlock devices that would immediately stop the machine should a worker attempt to gain access to a ram or the travel zone of a ram while the machine is operating, Harris has never taken steps to correct the "sleeping giant" problem or warn about it.  Plaintiff argues evidence that Harris' design engineers are not informed of deaths and injuries on their balers shows a conscious indifference, asserts Harris has decided it is cheaper to pay compensatory damages rather than improve the safety of balers.  This assertion is based upon Jobe's testimony that although he has testified in 25-30 depositions, he has never testified at trial, and the fact that Harris has hired expert

Karvelis in four lawsuits but has never hired his engineering firm to offer guidance or assistance in making their product safer.

In support of his claim for punitive damages against IPS, plaintiff argues IPS knew or should have known there were at least 34 fatalities between 1992 and 2000, in which victims were caught or crushed by the compacting ram of a baler, yet it provided no platform or interlock system which would have prevented a Jefferson County employee from proceeding up the conveyor to the hopper area and be directly exposed to the crushing compactor rams of the machine.  Further, plaintiff argues IPS' failure to warn Jefferson County of the injuries and death that had occurred with this particular baler is evidence of its reckless disregard for the safety of users.

The Court finds the remain genuine issues of material fact in dispute as to plaintiff's entitlement to punitive damages.  The Court finds there is evidence from which a reasonable jury could find that Harris or IPS acted with conscious indifference to the safety of others.

## Conclusion

For the reasons stated, defendants' motions for summary judgment [docket entries 46, 49, and 52] and defendants' motions to strike [docket entry 49 and 55] are hereby denied.  Plaintiff's motion to adopt and substitute [docket entry 73] and supplemental motion for leave to file motion and incorporated brief [docket entry 74] are granted.

SO ORDERED this 10th day of November 2005.


/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE